# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS

Filed: February 17, 2026

Refiled as Redacted: June 16, 2026

\* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| K.J., | \* | |
| | \* | |
| Petitioner, | \* | No. 18-1355 |
| | \* | |
| v. | \* | Special Master Gowen |
| | \* | |
| SECRETARY OF HEALTH | \* | |
| AND HUMAN SERVICES, | \* | |
| | \* | |
| | \* | |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \*

*Scott W. Rooney,* Nemes Rooney P.C., Farmington Hills, MI, for petitioner.
*Sarah B. Rifkin,* Dept. of Justice, Washington, D.C., for respondent.

### DECISION[1]

On September 5, 2018, K.J. ("petitioner") filed a petition for compensation in the National Vaccine Injury Compensation Program.[2] Petition ("Pet.") (ECF No. 1). Petitioner alleged that as a result of receiving the influenza ("flu") vaccine on October 7, 2015, she suffered from benign paroxysmal positional vertigo (BPPV) that has persisted continuously since the vaccination. *Id.* After a review of the record, I find that petitioner has not demonstrated by preponderant evidence that she is entitled to compensation and therefore, this petition must be **dismissed.**

### I.    Procedural History

---

[1] When this Decision was originally filed, I advised my intent to post it on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), Petitioner filed a timely motion to redact certain information. This Decision is being reissued with Petitioner's initials. Except for those changes and this footnote, no other substantive changes have been made. This Decision will be posted on the court's website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, with no further opportunity to move for redaction.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act"). Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

Petitioner filed her claim for compensation on September 5, 2018, alleging that the flu vaccine she received in her left deltoid on October 7, 2015, caused her to suffer pain in the left shoulder, vertigo, dizziness, and labyrinthitis. *See* Pet. Petitioner subsequently filed medical records to support her claim. Petitioner's ("Pet'r.") Exhibit ("Ex.") 1-9. On September 10, 2020, respondent filed a status report indicating that he was opposed to negotiation and intended to defend against the claim. Respondent's ("Resp't") Status Report ("Rept.") (ECF No. 44).

On January 11, 2021, respondent filed his Rule 4(c) report stating that this case was not appropriate for compensation. Resp't. Rept. at 1 (ECF No. 46). Respondent stated that petitioner has not filed an expert report or any medical or scientific explanation to support her claim that flu vaccine can cause labyrinthitis. *Id.* at 7. Further, respondent asserted that "none of the treating physicians causally related petitioner's labyrinthitis or symptoms to her receipt of a flu vaccine." *Id.* at 8. Respondent also questioned the onset of petitioner's labyrinthitis and stated that petitioner has not offered any medical or scientific evidence to support that 48-hours is a medically appropriate timeframe to infer a causal relationship with her flu vaccine. *Id.*

Thereafter, petitioner filed an expert report from David Axelrod, M.D. on June 29, 2021. Pet'r. Ex. 47 (ECF No. 54-13).[3] Petitioner filed a supplemental expert report from Hamid Djalilian, M.D. on July 30, 2021. Pet'r. Ex. 48 (ECF No. 56-1).[4]

---

[3] Dr. David Axelrod is a Clinical Immunologist who received training from McGill University- Royal Victoria Hospital and the National Institutes of Health (NIH) from 1978-1982. Pet'r. Ex. 22 at 1. Dr. Axelrod received his medical degree from the University of Michigan Medical School in 1974 and his Master of Science in Clinical Research Designs and Biostatistics from the University of Michigan School of Public Health in 1991. *Id.* Dr. Axelrod retired from clinical practice in 2018 but previously was involved with the diagnosis and treatment of individuals with drug reactions. *Id.* at 2. Dr. Axelrod is board certified in Internal Medicine, Adult Rheumatology, and Allergy & Immunology. *Id.* He has had multiple academic positions, most recently serving a visiting academic appointment at Penn State Hershey Medical Center from 2013-2016. *Id.* Further, Dr. Axelrod has authored or co-authored numerous medical articles in peer reviewed journals. *Id.* at 3-4. Dr. Axelrod has testified before in Vaccine Program cases as an expert in immunology, and thus is accepted as an expert in immunology for this matter as well.

[4] Dr. Hamid Djalilian is   board certified Otolaryngology. Head and Neck Surgery as well as Neurotology. Pet'r. Ex. 49 at 1. Dr. Djalilian received his undergraduate degree from Carleton College in 1992 and his medical degree from the University of Minnesota Medical School in 1996. *Id.* Following graduation, he had a surgical internship at the Hennepin County Medical Center and completed his residency in Otolaryngology- Head and Neck Surgery in 2001. *Id.* Dr. Djalilian is licensed to practice medicine in California. *Id.* Currently, he is a Professor of Clinical Otolaryngology and Director of the Division of Neurotology and Skull Base Surgery at the University of California Irvine Medical Center. *Id.* at 2. Dr. Djalilian is an editorial member of multiple journal review boards and has received numerous honors and special awards throughout his career. *Id.* at 4-8. He has published a book on Ear Nose and Throat disorders as well as authored or co-authored 150 medical article in peer reviewed journals. *Id.* at 8-23.

On December 27, 2021, respondent filed expert reports from Yu-Lan Mary Ying, M.D. and Mehrdad Matloubian, M.D., Ph.D. Resp't. Ex. A (ECF No. 61-1)[5]; Resp't. Ex. C (ECF No. 62).[6]

On February 10, 2022, I held a Rule 5 Status Conference. On May 16, 2022, the parties filed a joint status report stating that settlement negotiations were unsuccessful and that they wished to proceed with litigation.

On October 12, 2022, petitioner filed a motion for a ruling on the record. Pet'r. Mot. (ECF No. 68). Respondent filed a response on December 12, 2022, agreeing to have the case resolved on the record. Resp't. Brief ("Br.") (ECF No. 69). On January 4, 2024, petitioner filed a reply to respondent's response. Pet'r. Reply (ECF No. 74).

This matter is now ripe for adjudication.

## II.    Evidence Filed

### a.    Medical Records

At the time of vaccination, petitioner was sixty-one with a medical history of right knee osteoarthritis. Pet'r. Ex. 4 at 9. Petitioner had previously received the influenza vaccine numerous times. *See* Pet'r. Ex. 19. Petitioner's pre-vaccination medical history also indicated morbid obesity, neck pain, and back pain. Pet'r. Ex. 15 at 2. She had been regularly attending chiropractor appointments at Ireland Family Chiropractic for approximately six months prior to vaccination. *See* Pet'r. Ex. 10.

---

[5] Dr. Yu-Lan Mary Ying is a practicing otologist/neurotologist. Resp't. Ex. B at 2. She received her undergraduate degree from Massachusetts Institute of Technology (MIT) in 1998 and her medical degree from the State University of New York, Stony Brook School of Medicine in 2003. *Id.* at 1. Currently, Dr. Ying is an Associate Professor in the Department of Otology- Head and Neck Surgery at Rutgers-New Jersey Medical School and has medical appointments at University Hospital, St. Barnabas Hospital, Trinitas Regional Hospital, Hackensack UMC Mountainside Hospital, Hackensack University Medical Center, and Summit Medical Group. *Id.* at 2-3. Dr. Ying also serves on multiple national committees, such as the American Academy of Otolaryngology- Head and Neck Surgery the American Neurotology Society, as a member or contributing author. *Id.* at 5-6. Additionally, Dr. Ying serves as the Chair of the Self-Study Committee for Residency program in the Department of Otolaryngology- Head and Neck Surgery at Rutgers-NJ Medical School and has authored or co-authored 25 medical articles in peer reviewed journals. *Id.* at 11-13.

[6] Dr. Mehrdad Matloubian received his Ph.D. in Virology from the University of California, Los Angeles in 1996 and his medical degree, also from the University of California, Los Angeles, in 1996. Resp't. Ex. D at 1. He is board certified in Internal Medicine and Rheumatology. *Id.* at 2. In 2013, Dr. Matloubian began serving as an Associate Adjunct Professor in Medicine at the University of California, San Francisco, a position he still holds. *Id.* Dr. Matloubian also provides clinical services, specifically inpatient rheumatology consults and molecular medicine consults. *Id.* at 3. He serves on oral qualifying exam committees and doctoral thesis committees at the University of San Francisco, as well as serving on the editorial board of PLOSOne and being an ad hoc referee for the Journal of Experimental Medicine, Journal of Immunology, and European Journal of Immunology. *Id.* at 3, 5. Dr. Matloubian has authored or co-authored 39 medical articles in peer reviewed journals and is engaged in research in virology/immunology. *Id.* at 8, 10-13.

Petitioner received an intradermal influenza ("flu") vaccine on October 7, 2015, in her left deltoid from her employer. Pet'r. Ex. 2 at 2. Two days later, petitioner visited the emergency department of Bay Area Medical Center presenting with "nausea, vomiting, and dizziness." Pet'r. Ex. 13 at 4. Petitioner reported that "last night she started to vomit and that it feels like the room is spinning." *Id.* Petitioner also reported "that she recently had her flu shot at work." *Id.* A head CT without contrast was unremarkable, with "no evidence of hemorrhage, edema, mass, or mass effect." *Id.* at 10. Emergency Department Physician Dr. Richard Erdman diagnosed petitioner with benign paroxysmal positional vertigo (BPPV), unspecified laterally, and labyrinthitis, unspecified laterally. *Id.* at 11. The report noted that petitioner "had the evocable nystagmus that seems peripheral in origin." *Id.* Petitioner was discharged the same day to home/self-care and prescribed Dramamine for dizziness. *Id.*

On October 12, 2015, petitioner had an appointment with Kevin Ireland, D.C. at Ireland Family Chiropractic. Pet'r. Ex. 10 at 67. Petitioner reported that "on Thursday morning she received a flu shot at work and by Friday night, she was vomiting with dizziness and headache." *Id.* Petitioner's primary complaints included "anterior head with horrible dizziness, dull and aching discomfort." *Id.* On October 16, 2015, petitioner complained of "left trapezius dull and aching discomfort." *Id.* at 66. She also complained of "more pressure on the left side with sinuses and ear." *Id.* Throughout the remainder of 2015, she complained of issues such as "left side of neck and lumbar dull and aching discomfort," and "left trapezius and mild thoracic dull and aching discomfort." *Id.* at 44. On December 14, 2015, petitioner told physical therapist Kevin Ireland that she "had a meeting with a neurologist and they were doing blood work." *Id.*

On October 15, 2015, petitioner had an initial appointment at Barker Physical Therapy Clinic as a self-referral. Pet'r. Ex. 8 at 3. Petitioner reported receiving a flu shot and developing "severe nausea, dizziness, lightheadedness, visual changes, headaches, vertigo, and imbalance the following day." *Id.* She stated that the emergency department diagnosed her with "positional vertigo." *Id.* Her "Primary Concern" was for "constant dizziness, lightheadedness, and imbalance which increases with movements, such as walking and riding in a car." *Id.* Petitioner's gait was observed as unsteady and that she needed assistance walking. *Id.* It was noted that she had "cranial imbalance R greater than left with palpable tenderness in the right sinus region." *Id.* The assessment was that petitioner would "benefit from B horizontal BPPV treatment, cervical stretching, and cranial sacral therapy." *Id.* at 4. No visible nystagmus was observed, but petitioner reported dizziness. *Id.* Dr. Barker recommended that petitioner receive physical therapy treatment 1-2 times a week for 6 weeks. *Id.* Petitioner attended weekly physical therapy appointments until September 30, 2016, when her "symptoms plateaued." *Id.* at 121, 23.

On October 29, 2015, petitioner had an appointment with audiologist, Heather Schwartz, after being referred for a hearing evaluation. Pet'r. Ex. 4 at 17. Initially, petitioner's build up of ear wax made it difficult to observe her tympanic membrane in both ears. *Id.* Once cleared out, tympanometric results found "normal middle ear function" bilaterally. *Id.* Additionally, petitioner's "pure tone testing" demonstrated a "hearing sensitivity within normal limits bilaterally." *Id.* at 18.

Petitioner met with NP Kathleen Benson the same day where petitioner questioned if she had a sinus infection. Pet'r. Ex. 4 at 24. Nurse Benson diagnosed petitioner with bilateral

impacted cerumen, dizziness, and acute sinusitis and gave petitioner a prescription for a z-pack. *Id.* at 27.

Petitioner returned for a follow-up appointment with Nurse Benson on November 3, 2015. Pet'r. Ex. 4 at 29; Pet'r Ex. 20 at 32. Petitioner reported that she was "doing fairly well," but was experiencing lightheadedness and left facial pressure with throbbing." Pet'r. Ex. 4 at 31. Her dizziness was still present and unchanged. *Id.* Petitioner also had sinus congestion. *Id.* Nurse Benson noted that petitioner had not finished her Z-pack. *Id.* She also scheduled a videonystamography ("VNG") for evaluation of vertigo for November 4, 2015 for petitioner. *Id.* at 32.

The VNG showed "no clinically significant nystagmus noted in the neutral gaze position," but petitioner had a "four degree/second right beating post-head shake nystagmus" and a "rotary nystagmus and subjective vertigo in the head hand left position." Pet'r. Ex. 4 at 36. The biothermal caloric test was also abnormal, showing "94% unilateral weakness in the left ear." *Id.* The impression of the VNG was, "abnormal and indicative of a peripheral nervous system involvement. Results indicate left BPPV and a lesion of the left lateral canal or its afferent nerve. The presence of right beating post-head shake nystagmus indicates that central compensation is not yet complete." *Id.* a 36. The results of the VNG were forwarded to Baker Physical therapy, where petitioner was already being treated.

On November 11, 2015, at a physical therapy appointment, petitioner reported that her vertigo and dizziness had improved, decreasing from a 7 to a 4, although was still present. Pet'r. Ex. 8 at 17. At an appointment on November 17, 2015, petitioner reported dizziness, but "no nystagmus with Dix Hallpike testing" was observed. *Id.* at 19. On December 1, 2015, petitioner's left sided head pressure "remained a significant complaint," and the findings were that petitioner had "intermittent signs of BPPV, cranial imbalances, upper cervical restrictions, muscle guarding, visceral adhesions, and imbalance." *Id.* at 23.

Petitioner had a follow-up appointment on December 8, 2015, where she reported doing "fairly well" but "had complaints of dizziness, headaches, and neck and shoulder pain." *Id.* NP Kathleen Benson reported that according to petitioner, the treatment plan of physical therapy and chiropractor had been "minimally effective." *Id.* Petitioner was considering seeing a neurologist if symptoms persisted, which NP Kathleen Benson thought was reasonable. *Id.* at 48. NP Kathleen Benson noted that she told petitioner that "she did not feel her symptoms were related to sinus disease because her CT scan was clear." *Id.* Petitioner subsequently scheduled a Neurology appointment with Jean Dill, APNP for December 11, 2015. Pet'r. Ex. 13 at 50.

Petitioner had a neurology appointment on December 11, 2015, where medical records indicate that the reason for visit was "Consultation for BPPV." *Id.* Dr. Dill noted that petitioner's vertigo and dizziness began on October 10, 2015, when she went to the ER. *Id.* at 53. Petitioner stated that on October 10, 2015, "the room was spinning and her eyes felt funny (nystagmus)." *Id.* Petitioner also reported that her neck aches into her left arm and that "eye movement to the left make her [feel] funny or getting up she feels [like] she will fall." *Id.* Additionally, petitioner reported that she has a "headache over the bridge of the nose and the left eye," that "pulses and throbs." *Id.* at 54. The headache was also "sensitive to light, sensitive to sound, no nausea

5

lately." *Id.* During the neurological exam, petitioner reported a black spot in the right direct visual fieldand a "left sided rotary nystagmus" was noted "when looking to the left horizontal only." *Id.* at 57. Petitioner reported a decrease in cold sensation in her legs by 50% and her gait was "slow and unsteady." *Id.* Petitioner had a positive Romberg sign and falls backwards. *Id.* APNP Dill noted a "red rash to face sparing nasal folds and red rash to arms very light" under Autonomic Nervous System. *Id.* at 58. APNP Dill subsequently diagnosed petitioner with BPPV, Right, Daily Headache. Nystagmus, and BPPV, Left. *Id.* at 58—59. Three MRIs were ordered - MRI Brain, MRI Angiogram Brain Arterial, and MRI Angiogram Neck. *Id.* at 59. Petitioner was also prescribed Nortriptyline (Pamelor) 10 mg. as APNP Dill "suspected problems with the C5 based on some weakness and the positive Romberg x 2 going backward." *Id.* APNP Dill wrote:

> Looking up causes dizziness, nystagmus in the left horizontal visual field. Rule out mass lesion, stroke, dissection. She has been having rapid neck manipulations by chiropractor. She also sounds to have migraine related to this but there is more eye pressure to the left and dizziness to the left. Many treatments have failed since October 10th, going on two months.

*Id.* at 59. Petitioner was directed to follow-up in ten days.

On December 24, 2015, petitioner underwent three MRIs at Bay Area Medical Center. *Id.* at 73. The impression of the brain MRI with contrast was, "No evidence of acute stroke. Mild white matter foci as above may be from old small vessel ischemic disease changes or chronic migraines." *Id.* The MRA of the neck with contrast did not indicate any significant or severe vascular stenosis. *Id.* at 81. The MRA of the brain without contrast revealed that the left side posterior communicating arteries were diminutive but no significant intracranial vessel narrowing or evidence of aneurysm was found. *Id.* at 88.

On January 7, 2016, petitioner had a general neurology follow-up visit with Nurse Practitioner Dill. *Id.* at 94. Nurse Dill wrote that petitioner's "pain to the upper cervical region on the left can produce pain and pressure into the left side of [her] head and eye regions." *Id.* Petitioner reported that her BPPV "has greatly subsided with no signs of nystagmus," but that her head pressure and dizziness remained. *Id.* Petitioner's cervical region "continued to be limited and palpation recreates head and eye pressure on the left." *Id.* Nurse Dill also wrote that petitioner's "left-sided neck pain radiates up into the left side of her head and she has a constant headache there." *Id.* Further, she wrote that petitioner has "a history of migraines, but she does not feel that these are migraines." Petitioner was unable to tolerate Nortriptyline. *Id.* at 95. The During the neurological exam, petitioner did not have the left-sided horizontal rotary nystagmus that was observed on the prior exam. *Id.* at 98. Petitioner was still walking with a cane and had a positive Romberg test. *Id.* Nurse Dill wrote that petitioner's nystagmus has improved, but that she has continued neck pain and "a component of migraine." *Id.* Petitioner was prescribed 100 mg of gabapentin and an MRI of her cervical spine was ordered. *Id.*

6

Petitioner underwent a Cervical Spine MRI without contrast on January 20, 2016. *Id.* at 103. At the C3-C4 level there was, "prominent posterior and posterior bilateral subligamentous disc bulging," and it "flattens the cord especially just to the right of midline." The radiologist opined that "This could possibly cause some early spinal stenosis symptoms." *Id.* Additionally, at the C6-C7 level, there was "bilateral uncovertebral osteophytosis moderately narrowing the neural foramina, left slightly greater than right," and at the C7-T1 level there was "prominent subligamentous disc bulging," that was "most prominent centrally." *Id.* at 105. The impression was, "There is significant multilevel spondylosis as described above. The most significant abnormalities at the C3-C4 level." *Id.*

On January 21, 2016, petitioner had a consultation appointment with neurologist, Dr. Merle L. Teetzen. *Id.* at 114. Under "History of Present Illness," petitioner reported a "floating sensation and swaying feeling," along with a "pressure sensation involving the bifrontal area." *Id.* Petitioner reported, "fairly frequent headaches which seem to come up the back of the head and goes to the forehead and the eyes," and rated the headaches between a 1-5 out of 10. *Id.* Petitioner also reported neck pain that was radiating into the shoulders. *Id.* An examination of petitioner's cranial nerves revealed no nystagmus or double vision. *Id.* at 117. The Romberg coordination evaluation during the physical examination "resulted in significant swaying" and Dr. Teetzen had to support petitioner. *Id.* at 117. Dr. Teetzen prescribed a trial of prednisone starting at 60 mg daily and tapering over 8 days to treat petitioner's BPPV, noting that petitioner was experiencing "very persistent symptoms with no indication of abatement." *Id.* Additionally, he diagnosed petitioner with "Chronic daily headache," and stated, "There is a strong component of muscle tension involved with the headache, and this may relate to the cervical spine issues." *Id.* at 117. He recommended that she stop the gabapentin. Dr. Teetzen also diagnosed petitioner with spondylosis of the cervical region and cervical stenosis of the spinal canal. *Id.*

On January 26, 2016, petitioner had an appointment at Barker Physical Therapy Clinic. Pet'r. Ex. 8 at 54. Under "Current Complaints," petitioner reported "head pressure and visual problems remain a significant complain on the left side with intermittent neck and left shoulder pains and crepitus." *Id.* The objective findings stated, "Palpation reproduces pain traveling from the posterior cervical region into the head, forehead, and eye region left greater than right." *Id.* Under "Assessment/Diagnosis," the record provides, "Cervical MRI 1-20-2016 indicates multilevel degenerative changes with the most significant occurring at C3/4….Patient appears to have referred pain when the upper cervical region is palpated. Recommend further upper cervical PT, massage, chiropractic, home stretching, and dry needling." *Id.*

Petitioner had a follow-up appointment for dizziness with Dr. Teetzen on February 3, 2016. *Id.* at 119. Petitioner indicated that the prednisone had been "really of no benefit to her" and that she was feeling "very congested in the nose and sinuses; as if her head is stuck in a jar of peanut butter." *Id.* at 122. Petitioner's balance was off, and she could not walk safely without the cane; however, she reported that "she did not have the spinning or whirling sensations, but she has a sensation that her head is floating." *Id.* Dr. Teetzen's review of systems indicated that petitioner had blurred vision and "light hurts eyes," as well as neurological problems of "dizziness, headache, balance problems, and memory problems." *Id.* at 123-24. The Romberg coordination test showed mild-moderate swaying. *Id.* at 124. Dr. Teetzen prescribed meclizine

7

for 7-10 days to address the light headedness and noted that "balance in clearly not normal; so far there is no definite explanation." *Id.*

Petitioner had a follow-up appointment with Dr. Teetzen two weeks later on February 17, 2016, when she indicated that "the feelings of pressure in the head and a floating sensation along with balance problems continue, but at least nothing is worse." *Id.* at 129. Petitioner also expressed that she was very happy with the work being done at Barker Physical Therapy and that some dry needling was being tried to alleviate symptoms. *Id.* The review of systems indicated the same problems as the previous appointment and petitioner indicated that the only thing, she has noted from the meclizine prescription is that she is more tired. *Id.* at 129—30. Dr. Teetzen noted that the light headedness "may actually be a form of vertigo as petitioner describes it as a floating feeling" and recommended that petitioner continue with current therapies and follow up in three weeks for the head pain and dizziness. *Id.* at 131.

On March 9, 2016, petitioner had a follow-up appointment with Dr. Teetzen. *Id.* at 136. Petitioner reported that taking the meclizine regularly has not had any effect on her balance and that the dizziness and balance problems are unchanged. *Id.* The physical examination revealed moderate-marked swaying on standing with her feet together. *Id.* at 138. Dr. Teetzen noted "I do not know what to do for petitioner that might improve her balance or her vertigo symptoms" and referred her to the Froedtert & Medical College of Wisconsin for a second opinion. *Id.* at 139.

On April 27, 2016, petitioner had her first appointment at Froedtert Center for Advanced Care and was referred to neurology to see headache specialist Dr. Fallon Schloemer. Pet'r. Ex. 7 at 8. The order comments indicated that based off of the completed questionnaire, the petitioner might have Vestibular Neuritis. *Id.* at 8. On the intake documents, petitioner described the dizziness as "vertigo, wooziness, imbalance, faint or lightheaded, swimming sensation inside your head, pulsion, and headaches. *Id.* at 65. Petitioner indicated that imbalance, lightheadedness, tumbling or spinning sensation, and neck stiffness are never stopping; the symptoms of being off balance when standing or walking, headaches, and neck stiffness were reported as occurring in spells. *Id.* at 66. Petitioner described the spells as lasting either minutes to hours, but less than 24 hours, or, measured in days, can last continuously for weeks. *Id.* The frequency of the spells was reported by petitioner as occurring daily or multiple times per day, multiple times per week, multiple times per month, and several times in a six-month interval. *Id.* at 67. Petitioner stated that she had never been diagnosed with migraine headaches. *Id.* at 68.

Petitioner had a neurology consultation for evaluation of headaches and dizziness with Dr. Schloemer on June 27, 2016. *Id.* at 18. Dr. Schloemer noted that petitioner "thinks this could have been related to the flu shot as symptom onset was shortly thereafter." *Id.* at 19. During a neurologic review of symptoms, petitioner denied the presence of anxiety, depression, hearing loss, gait disturbances, memory loss, seizures, tinnitus, or visual loss. *Id.* Dr. Schloemer personally reviewed the MRI of the brain and the MRI of the C spine, concluding that the results were notable for Degenerative Joint Disease (DJD) and mild chronic microvascular changes. *Id.* at 21. Dr. Schloemer's impression concluded that petitioner's history of left labyrinthitis could be contributory, but that petitioner meets the criteria for vestibular migraine, likely as a component of persistent postural perceptual dizziness (PPPD) as well as cervicogenic dizziness. *Id.* The exam results were also notable for left occipital neuralgia. *Id.* Dr. Schloemer had

concerns that medication overuse was contributory. *Id.* The diagnosis from this visit was chronic migraine, medication overuse headache, and dizziness. *Id.* at 26. Dr. Schloemer prescribed Effexor for headache prevention, indomethacin and tizanidine for acute headache treatment as needed, and instructed petitioner to continue physical therapy/vestibular therapy. *Id.* at 27.

On June 27, 2016, petitioner also had an appointment with Dr. David Friedland where the chief complaint was "vestibular dysfunction." *Id.* at 52. Petitioner stated that although the nausea, vomiting, and "out of control vertigo" are no longer present, she suffers from a chronic sense of imbalance that feels like "she is falling forward." *Id.* Petitioner complained of chronic head pressure, neck pain, persistent headaches, light sensitivity, visual sensitivity, and left upper extremity pain. *Id.* at 53. Petitioner denied any hearing loss or hearing fluctuation and has had no constant tinnitus. *Id.* Dr. Friedland noted that "the only association was the flu vaccine a few days before this happened" and that petitioner is not working due to the dizziness. *Id.* Upon reviewing petitioner's previous records, Dr. Friedland noted that the MRI findings were consistent with chronic migraine and that the audiogram showed normal hearing in both ears. *Id.* at 54. Dr. Friedland performed an otologic assessment and both the left and right ear results were unremarkable. *Id.* at 55. After the examination, Dr. Friedland concluded that petitioner's issues are consistent with both vestibular migraine and PPPD. *Id.* Dr. Friedland agreed with Dr. Schloemer's assessment and recommendations and reassured petitioner that the ears are not the issue. *Id.* at 56. Dr. Friedland determined that there is no further intervention or testing necessary for the peripheral vestibular system and concluded that given petitioner's medical history and his evaluation, petitioner has vestibular migraine, dizziness, and left vestibular neuritis. *Id.*

Petitioner had a follow-up appointment with Dr. Schloemer on August 29, 2016. *Id.* at 130. Petitioner presented hypertensive with a systolic blood pressure range of 197-219. *Id.* Medical records indicate that the follow-up was for "vestibular migraine and PPPD" and that petitioner's symptoms remained relatively unchanged. *Id.* Dr. Schloemer noted that the Effexor, indomethacin, and tizanidine prescriptions have not caused significant improvement but instructed petitioner to continue taking the prescriptions. *Id.* at 138. Progress notes indicated that petitioner "presenting very hypertensive certainly could be contributory" and encouraged an urgent follow-up with a petitioner's primary care physician. *Id.* Additionally, Dr. Schloemer started petitioner on propranolol to help with blood pressure and headache. *Id.* Petitioner stated that prior to October she "never really got headaches or dizziness." *Id.* at 131.

### b. Petitioner's Expert Reports

#### 1. Dr. David Axelrod

On June 29, 2021, petitioner filed an expert report from Clinical Immunologist Dr. David Axelrod. Pet'r Ex. 47 (ECF No. 54-13). Dr. Axelrod stated that petitioner's treating physicians diagnosed her with Benign Paroxysmal Positional Vertigo, but that her symptoms may suggest a diagnosis of vestibular neuronitis. *Id.* at 2. Relying on an article by Omron[7] stating that the symptoms of BPPV go away completely when not triggered, whereas the symptoms of Vestibular Neuritis remain at rest and worsen with movement, Dr. Axelrod noted that petitioner's symptomology may indicate a diagnosis of Vestibular Neuritis rather than benign

---

[7] Omron

paroxysmal positional vertigo (BPPV) because petitioner's caregivers noted on multiple occasions that petitioner's symptoms were constant. *Id.* at 2; Pet'r Ex. 23 at 10.[8] Dr. Axelrod deferred to an otolaryngologist or neurologist, for the appropriate diagnosis.

Nevertheless, Dr. Axelrod opined that the flu vaccine petitioner on October 7, 2015, caused her to develop an inflammatory disease of the vestibular ganglia, through the mechanism of molecular mimicry. *Id.* at 2. Dr. Axelrod gave a general overview of the acceptance of molecular mimicry in medical literature to induce autoimmune disease. *Id.* at 3. An article by Maoz-Segal explained that "sequence similarity between foreign and self-peptides (the host's antigen) enable pathogens that mimic self-epitopes to evade the immune system and lead to an immunological tolerance." Pet'r. Ex. 31 at 1.[9] Maoz-Segal identify several common infectious agents and autoimmune conditions, including *campylobacter jejuni* and GBS and *streptococcus pyogenes* and rheumatic fever, where molecular mimicry has been demonstrated as across-reaction between the proteins in the pathogen and self-antigens. *Id.* at 3. The Wildner article Dr. Axelrod referenced also explained that molecular mimicry can occur when "pathogens accidendently provide antigen peptides with similarity to autoantigens, cross-reactive immune responses can lead to an attack focused on self-antigens expressed by the host tissue." Pet'r. Ex. 30 at 3.[10] The authors stated that "molecular mimicry of environmental antigens in conjunction with the ability of T cells to escape immune tolerance has been suggested as a potential mechanism for the pathogenesis not only of autoimmune uveitis, but also of other autoimmune diseases, including: multiple sclerosis, diabetes mellitus, and spondyloarthropathies." *Id.* at 5.

Specific to this case, Dr. Axelrod stated that "vaccines are developed to mimic the infectious agents without causing infection" and that the immune response to the structures of the influenza virus in the vaccine are created to protect from an influenza infection. Pet'r. Ex. 47 at 4. "If there are similar or homologous structures on self-antigens, then the immune response to the vaccine structures can also react to the self-antigens." *Id.*

Dr. Axelrod explained that the Gacek article suggests that Benign Paroxysmal Positional Vertigo ("BPPV") is not a mechanical alteration to the vestibular system but also has a possible neural component. Pet'r. Ex. 47 at 3, 4; Pet'r. Ex. 25 at 1.[11] The article explains that BPPV is a balance disorder that consists of a "brief episode of vertigo" that follows after a hyperextended head position, when one ear faces the ground and another faces away from the ground. Pet'r. Ex. 25 at 1. A nystagmus response can also be seen in BPPV. *Id.* Gacek examined temporal bones of five patients with BPPV and found the "major abnormality" in these patients were a loss of vestibular ganglion cells, resulting in symptoms such as vertigo or a nystagmus. *Id.* at 3. Gacek hypothesized that the cause of the ganglionic degeneration "is probably the reactivation of latent

---

[8] Rodney Omron, *Peripheral Vertigo* Emergency Medical Clinic North American 37, 11-28 (2019). [Pet'r. Ex. 23].

[9] Maoz-Segal, Ramit et al., *Infection & Autoimmunity: Chapter 3: Molecular Mimicry and Autoimmunity,* http://dx.doi.org/10.1016/B978-0-444-63269-2.00054-4 (2015). [Pet'r. Ex. 31].

[10] Wildner, G. & Diedrichs-Mohring, M., *Molecular Mimicry and Uveitis,* 11 Front. in Immunol., doi: 10.3389/fimmu.2020.580636 (2020). [Pet'r. Ex. 30].

[11] Richard R. Gacek, *Pathology of Benign Paroxysmal Positional Vertigo Revisited*, Ann Otol Rhinol Laryngol, 574-82 (2003). [Pet'r. Ex. 25].

neurotropic viral infection," and that "[m]embers of the alpha herpes virinae group are the most likely causative agents because of their ubiquity, their affinity for sensory ganglia, and the presence of viral DNA products in patients with vestibular ganglionitis." *Id.* at 6. Additionally, the article states:

> The common occurrence of BPPV in ears with Meniere's disease, vestibular neuronitis, and idiopathic facial paralysis, as well as other cranial neuropathies (zoster, labialis simplex), represents clinical support for this viral form of vestibular ganglionitis in BPPV.

*Id.* at 6.

Specific to this case, Dr. Axelrod stated that there are specific perilymph specific proteins in the inner ear, which may be affected in vestibular dysfunction. Lin et al. studied the perilymph, the proximal fluid of the inner ear, and identified different proteins that were prevalent in inner ear diseases. Pet'r. Ex. 47 at 5; Pet'r. Ex. 37.[12] Lin identified "alpha-1-antichymotrypsin (AACT)" in the perilymph of patients with vestibular dysfunction, and explained that the AACT "is a member of the Serpin family of protease inhibitors" which are "major regulators of enzymatic activity and they reduce protease-induced tissue injury." *Id.* at 13. But "aberrant protease activation has been associated with inner ear damage and hearing impairment," and that "In multiple models of degenerative diseases including cirrhosis and emphysema, AACT appears to regulate protease-mediated tissue damage and homeostasis." *Id.* He also referenced Schmitt et al. which identified additional perilymph-specific proteins, and Dr. Axelrod stated that "an immune reaction that targets any of these peptides could damage the vestibular nuclei and cause vertigo." Pet'r. Ex. 47 at 5.

Dr. Axelrod then compared the protein structures of the flu strains included in the vaccine petitioner received to the protein structures of the cells in the perilymph and identified 5 self-antigens that have similar or homologous structures to the hemagglutinin contained in the flu vaccine that petitioner received (strain A/California/7/2009 H1N1-like)– Human Lipocalin-15, Human Apoliproprotein D, Human Prolargin, Human Prolargin, and Human Nidogen-1. Pet'r. Ex. 47 at 6. He opined that petitioner's response to the "Influenza A virus hemagglutinin caused her immune system to react with human peptides of the vestibular ganglia, resulting in inflammatory damage to the vestibular ganglia, with resultant vertigo." *Id.*

Dr. Axelrod wrote that the temporal association between the vaccination and petitioner's onset of vertigo, around three days, is consistent with a secondary adaptive immune response to the flu vaccination. *Id.* at 9. As a result, Dr. Axelrod stated that "based upon the medical records provided and peer reviewed medical literature, it is most likely that petitioner developed her vertigo as a result of the flu vaccination of October 7, 2015." *Id.* at 9.

### 2. Dr. Hamid Djalilian

---

[12] Lin, H-C. et al., *Proteome of Normal Human Perilymph and Perilymph from People with Disabling Vertigo,* Plos One https://doi.org/10.1371/journal.pone.0218292 (2019). [Pet'r. Ex. 37].

On July 30, 2021, petitioner submitted an additional expert report from Otolaryngologist and Neurotologist Dr. Hamid Djalilian. Pet'r. Ex. 48 (ECF No. 56-1). Dr. Djalilian opined that the "vaccination in petitioner on October 7, 2015, induced a migraine phenomenon that led to migraine related benign positional vertigo within 72 hours, which progressed into subsequent chronic BPPV." *Id.* at 14. Dr. Djalilian stated that "a review of the influenza vaccine literature shows that headaches and migraine are the most common adverse side effects reported in the literature." *Id.*; *see also* Pet'r. Ex. 50-56. Dr. Djalilian postulated that the induction of migraine as a result of vaccination is "likely due to an immune mechanism or potentially sensitivity to the egg-related protein in the influenza vaccine." Pet'r. Ex. 48 at 14.

Dr. Djalilian, referring to the Liu et al. article, stated that "a subset of patients with migraine develop symptoms related to the ear." Pet'r. Ex. 48 at 14. Liu is a case report of a patient who had a history of migraines and steady left-sided sensorineural hearing loss, but began experiencing right-sided fluctuating hearing loss, tinnitus, and aural fullness, in addition to severe migraines. Pet'r. Ex. 75.[13] The patient in the case report also did not experience vertigo. The Liu authors noted that the temporal relationship between the migraines and the hearing loss "implicates migraines as causative." *Id.* at 5.

Dr. Djalilian's report suggested that migraine and BPPV are related. He stated that he "routinely see[s] patients who develop chronic recurrent BPPV as a result of migraine related phenomena." Pet'r. Ex. 48 at 15. He also referred to   an article by Vass et al. , which suggests that "vertigo, tinnitus, and hearing deficits associated with basilar migraine could arise by excitation of the trigeminal nerve fibers in the cochlea, resulting in local plasma extravasation." *Id.*; *see also* Pet'r. Ex. 76 at 1.[14] He also stated that some patients with vestibular migraines can also have features of BPPV, "where the patient has symptoms suggestive of BPPV, but they are truly suffering from vestibular migraine." Pet'r. Ex. 48 at 15. He referred to the Yu et al., which explained how BPPV and vestibular migraines are related. Pet'r. Ex. 77.[15]

Yu explains that "pseudo-benign paroxysmal positional vertigo is a specific type of vestibular migraine disguised as BPPV." *Id.* at 1. The authors explained that there are "notable differences" between pseudo-BPPV and BPPV, specifically the accompanying of migraine features of pseudo-BPPV, "whereas BPPV is characterized by positional vertigo without any accompanying migraine symptoms." *Id.* at 5. Further, the authors note that "headaches in pseudo-BPPV are not as intense or typical as migraines, and some patients describe their headaches as a feeling of fullness in the head." *Id.* Yu states, "In addition, the patients with previous history of migraine but lack of accompanying migrainous symptoms during vertigo could also be included into pseudo-BPPV, because these patients met the diagnosis of probable [vestibular migraine]." *Id.*

---

[13] Liu, I. et al., *Bilateral Endolymphatic Hydrops in a Patient with Migraine Variant without Vertigo: A Case Report,* 57 Headache 455-59 (2017).  [Pet'r. Ex. 75].

[14] Vass, Z. et al., *Permeability in Cochlear and Vertebro-Basilar Arteries: A Potential Cause of Inner Ear Dysfunction in Headache,* 103 Neuroscience 189-2001 (201).  [Pet'r Ex. 76].

[15] Yu, J. et al., *Pseudo-Benign Paroxysmal Positional Vertigo: A Retrospective Study and Case Report,* 11 Frontiers in Neurol. https://doi.org/10.3389/fneur.2020.00187 (2020).  [Pet'r. Ex. 77].

Dr. Djalilian explained that petitioner's symptoms of dizziness, which appeared 72 hours after vaccination were "the first sign of migraine affecting her ear, termed vestibular migraine leading to BPPV." Pet'r. Ex. 48 at 15. He stated, "[t]he migraine process in the brain generally occurs a short time after the triggering event," and "it is generally not beyond a week from the event." *Id.* Dr. Djalilian wrote that headaches are a common adverse event reported shortly after the flu vaccine and that "the root cause of nearly most headaches is a variant of migraine." *Id.* He opined that the flu vaccine petitioner received in October 2015 "initially induced the migraine process in [petitioner], which likely resulted in the vertigo within 72 hours of the vaccination," and that the migraine process "led to chronic vertigo which more likely than not is partly due to vestibular migraine." *Id.*

### c. Respondent's Expert Reports

#### 1. Dr. Yu-Lan Mary Ying

Respondent submitted an expert report from Otologist/Neurotologist Dr. Yu-Lan Mary Ying. Resp't. Ex. A (ECF No. 61-1). After reviewing petitioner's medical records and the reports written by Drs. Axelrod and Djalilian, Dr. Ying disagreed with Drs. Axelrod and Djalilian and concluded that "based on my review of the provided medical records, there is insufficient evidence to support petitioner's claim of dizziness and imbalance due to an adverse reaction to a flu vaccination administered on October 7, 2015." *Id.* at 7.

Dr. Ying opined that petitioner met the diagnostic criteria for Vestibular Migraine, Persistent Postural-Perceptual Dizziness (PPPD), and Cervicogenic Dizziness. *Id.* at 6. Dr. Ying stated that petitioner's "persistent dizziness and imbalance (nine months after 10/7/2015 flu vaccination) indicates that petitioner initially suffered vestibular neuritis (based on VNG dated 11/4/2015 without hearing loss) that has progressed to PPPD." *Id.*

Dr. Ying wrote that "vestibular migraine is considered the second most common cause of vertigo after BPPV and the most common cause of spontaneous episodic vertigo." Resp't. Ex. A at 5. The Bisdorff article explains that "case-control studies have found an association between migraine, vertigo, and dizziness beyond chance," but that the first operational diagnosis of vestibular migraine was proposed in 2003, despite vestibular migraine representing the second most common cause of vertigo after benign positional vertigo. Resp't. Ex. A, Tab 3 at 6. Symptoms of vestibular migraine vary and include spontaneous and positional vertigo, head motion vertigo/dizziness and ataxia of variable duration, ranging from second to days. *Id.* at 2. Additionally, these episodes or symptoms may not correspond with a headache. *Id.* Treatment for vestibular migraine is focused on treating the acute vertigo, which can include antivertiginous and antiemetic drugs. *Id.* Additionally, vestibular rehabilitation may provide some relief of symptoms. *Id.* at 2.

Dr. Ying also opined that petitioner's clinical symptoms and presentation makes the diagnoses of persistent postural-perceptual dizziness ("PPPD") and cervicogenic dizziness as well. Resp't. Ex. A at 5-6. With respect to PPPD, Dr. Ying stated that it is a relatively "newly defined diagnostic syndrome that unifies key features of chronic subjective dizziness, phobic postural vertigo and related disorders." *Id.* at 5. The Staab et al article Dr. Ying refered to,

explains that PPPD is a "chronic functional vestibular disorder."  Resp't. Ex. A, Tab 5 at 5.  The criteria to make a diagnosis of PPPD is:

    A) one or more symptoms of dizziness, unsteadiness, or non-spinning vertigo are present on most days for 3 months or more.  Symptoms last for prolonged period of time, but may wax and wane in severity;

    B) Persistent symptoms occur without specific provocation but are exacerbated by three factors: 1) upright posture; 2) active or passive motion without regard to direction or position; and 3) exposure to moving visual stimuli or complex visual patterns.

    C) The disorder is precipitated by conditions that cause vertigo, unsteadiness, dizziness, or problems with balance including acute, episodic, or chronic vestibular syndromes, other neurological or medical illnesses, or psychological distress.

    D) Symptoms cause significant distress or functional impairment.

    E) Symptoms are not better accounted for by another disease or disorder.

*Id.* at 5.  A patient must meet all five criteria to make a diagnosis of PPPD.  *Id.*  Dr. Ying opined that petitioner's persistent dizziness and imbalance that was present nine months after vaccination progressed to PPPD.  Resp't. Ex. A at 6.

Addressing Dr. Axelrod's theory of vaccine causation, Dr. Ying argued that Dr. Axelrod's mechanism of molecular mimicry suggests that petitioner developed a vestibular autoimmune condition, but that petitioner's symptoms and clinical course were inconsistent with autoimmune conditions affecting the inner ear.  Resp't. Ex. A at 7-8.  Dr. Ying noted that petitioner did not develop hearing loss in any ear, based on an audiogram performed on October 29, 2015, which is a feature of autoimmune inner ear disease.  *Id.* at 8.  Additionally, Dr. Ying stated that the rapid onset of petitioner's transient hearing loss 72-hours after vaccination is too short of a time for autoimmune inner ear disease to develop.  *Id.* at 8.  She also noted that petitioner used steroids without any improvement in symptoms, suggesting that petitioner's injury is not immune mediated.  *Id.* at 7-8.  Finally, Dr. Ying appeared to agree with Dr. Axelrod that petitioner could have initially suffered from vestibular neuritis rather than BPPV, but stated that the article Dr. Axelrod referenced suggested that vestibular neuritis is likely due to an activation of a herpes virus rather than an autoimmune process.  *Id.* at 8; *see also* Pet'r. Ex. 23.

In evaluating Dr. Djalilian's report, Dr. Ying argued that later medical records do not support the diagnosis of BPPV in petitioner's persistent dizziness symptoms. *Id.* at 9.  Dr. Ying distinguishes the articles cited in support by Dr. Djalilian, stating that "petitioner received the influenza vaccine intramuscularly and did not ingest it." *Id.*  Dr. Ying further argued that the theory proposed by Dr. Djalilian is "a novel theory" and that "while Dr. Djalilian cited several studies to support the high incidence of headaches after influenza immunizations, none of these studies were done with the type of influenza vaccine that petitioner received on October 7, 2015." *Id.*

Dr. Ying argued that petitioner's medical records indicate that petitioner likely had pre-vaccination migraines, noting Dr. Dill's note from January 7, 2016, that "petitioner does have a history of migraines but does not feel that these are migraines" as well as the MRI of the brain

14

from December 24, 2015, showing "mild white matter foci that may be from old small ischemic disease changes or chronic migraines." *Id.* at 10; Pet'r. Ex. 13 at 95; Pet'r. Ex. 7 at 96-97.

Dr. Ying noted that "a temporal relationship between an influenza vaccination and dizziness and headaches in petitioner's case does not automatically equate to causality for her developing dizziness." Resp't Ex. A at 11. From this, Dr. Ying concluded that "more than likely, petitioner has other known medical conditions (i.e., cervicogenic dizziness, migraine headaches, and vestibular neuritis) that progressed to PPPD." *Id.* Dr. Ying stated, "petitioner's claim that the influenza vaccination she received on October 7, 2015 caused her to develop dizziness and headaches via the proposed theory of linking migraine and autoimmune process is NOT supported by the evidence here, and the vaccination was NOT the likely cause of her alleged injuries." *Id.*

### 2. Dr. Mehrdad Matloubian

Dr. Mehrdad Matloubian, an Immunologist and Rheumatologist, also wrote an expert report for respondent. Resp't Ex. C (ECF No. 62-1). Dr. Matloubian's opinion is that petitioner's "development of vertigo, possibly due to vestibular neuritis, was not a direct consequence of her October 7, 2015, influenza immunization." *Id.* at 15. He stated that Dr. Axelrod's medical theory of causation remains "highly speculative" and that Dr. Djalilian "has not provided any evidence to support a mechanistic link between an influenza immunization and development of a migraine." *Id.*

Dr. Matloubian conceded that "as a rheumatologist, I am not an expert in diagnosis and treatment of vertigo and would leave the specific diagnosis in this case to an OHNS/ENT expert." *Id.* at 5. However, Dr. Matloubian stated that he can comment on the "likelihood of petitioner's vertigo being due to an autoimmune process." *Id.* He argued that autoimmune inner ear diseases usually cause a "bilateral sensorineural hearing loss" that progresses over the course of 3 to 90 days. *Id.* In addition, Dr. Matloubian analyzed the etiology of BPPV and vestibular neuritis, noting that "the cause of vestibular neuritis is not known" but that it is "thought to be due to activation of latent herpes simplex virus-1 in the vestibular ganglia leading to damage to this organ." *Id.* As a result, Dr. Matloubian stated that "it is highly unlikely that petitioner's symptoms of vertigo were due to an autoimmune process that was initiated or exacerbated by her influenza vaccination of October 7, 2015. *Id.* at 6.

Then, Dr. Matloubian stated that "according to a recent review of vestibular migraine, it remains a poorly defined and understood entity." *Id.*; Resp't. Ex. C-4 at 1. The authors of the article listed factors that have hindered the study of vestibular migraine, namely, "clinical manifestation that vary and overlap with other vestibular disorders, poor understanding of underlying pathophysiology of migraine, a lack of biologic markers or specific tests, lack of standard nomenclature, and only recently developed and evolving consensus diagnostic criteria." *Id.* Dr. Matloubian stated that with respect to the etiology of vestibular migraine, the mechanisms underlying vestibular migraine are also incompletely understood." Resp't. Ex. C at 6. From this, Dr. Matloubian concluded that it is "highly unlikely that petitioner's influenza immunization of October 7, 2015, could have led to or aggravated her potential vestibular migraine through an autoimmune inflammatory process." *Id.* at 6-7.

In responding to Dr. Axelrod's report, Dr. Matloubian agrees that petitioner's initial presentation is consistent with a diagnosis of vestibular neuritis rather than BPPV. *Id.* at 7. However, Dr. Matloubian disagrees that petitioner developed this disease through a mechanism based on molecular mimicry with influenza vaccine components. *Id.* He argued that, with respect to the etiology of vestibular neuritis, "the most popular theory is that of a viral cause, but the evidence remains circumstantial." *Id.* Dr. Matloubian further argues against the mechanism of molecular mimicry, stating that "the major shortcoming of Dr. Axelrod's sequence homology approach is that without knowing what MHC/HLA molecules petitioner has, there is no way for him or anyone else to predict which peptides will potentially be seen by her T cells." *Id.* at 10. Therefore, Dr. Matloubian concluded that Dr. Axelrod's theory of molecular mimicry is "highly speculative and without a strong foundational scientific support." *Id.* Dr. Matloubian also stated that "if a T cell mediated process through molecular mimicry could cause vestibular neuritis, I would expect a period of at least one week after immunization before it occurs," however, he conceded that memory T cell responses are "much faster and tend to occur within 2-3 days after re-exposure." *Id.* at 12.

Dr. Matloubian criticized Dr. Djalilian's report, stating that "petitioner seems to have had migraines before her October 7, 2015, influenza immunization- not induced by it." *Id.* at 13. Further, Dr. Matloubian raises the argument that "none of the studies of influenza immunization that were provided by Dr. Djalilian use a placebo immunized control group for comparison." *Id.* Dr. Matloubian states that because of this, "one cannot conclude from those studies that the headache those vaccinated individuals experienced were due to the influenza immunization rather than coincidental occurrence." *Id.* Therefore, Dr. Matloubian concludes that "there does not seem to be a reliable link between immunizations and triggering of migraine to support Dr. Djalilian's medical theory of causation." *Id.* Dr. Matloubian also questioned Dr. Djalilian's assertion that "the root cause of nearly most headaches is a variant of migraine" on the basis that a literature search makes it clear that "many forms of headaches are generally recognized in clinical practice in addition to migraines." *Id*. at 14-15.

Dr. Matloubian concluded the report by stating that "based on this analysis, in my opinion, petitioner's development of vertigo, possibly due to vestibular neuritis was not a direct consequence of her October 7, 2015, influenza immunization. *Id.* at 15.

## III.    Legal Standard

The Vaccine Act was established to compensate vaccine-related injuries and deaths. Section 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair, and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" *Rooks v. Sec'y of Health & Human Servs.*, 35 Fed. Cl. 1, 7 (1996) (quoting H.R. No. 908 at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. *Moberly v. Sec'y of Health & Hum. Servs.,* 592 F.3d 1315,

1322 n.2 (Fed. Cir. 2010). Proof of medical certainty is not required.  *Bunting v. Sec'y of Health & Hum. Servs.,* 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, petitioner must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *see also Pafford v. Sec'y of Health & Hum. Servs.,* 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner who satisfies this burden is entitled to compensation unless respondent can prove, by a preponderance of the evidence, that the vaccinee's injury is due to factors unrelated to the administration of the vaccine." § 13(a)(1)(B).

## A.  Nature of Injury

The Federal Circuit established the test for actual causation of an off-Table injury in *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278.  In that case: "There was no dispute as to whether the petitioner, Margaret Althen, actually suffered from a central nervous system demyelinating disorder.  Therefore, the Federal Circuit was not presented with a case in which the diagnosis itself was questioned, but one in which causation of the injury by the vaccine was the issue in dispute."  *Doe v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 597, 611 (2010) (citing *Althen*, 418 F.3d at 1282), *aff'd, Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d 1343 (Fed. Cir. 2011).

Special masters are generally not tasked with diagnosing injuries. *See Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994). In *Contreras*, the Federal Circuit explained: "The general rule is that a special master should not conduct a differential diagnosis, at the outset of the causation analysis, to choose one diagnosis over another, or over a combination of diagnoses." *Contreras v. Sec'y of Heath & Hum. Servs.*, 107 Fed. Cl. 280, 293 (2012) (citing *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 149–50 (Fed. Cir. 2011); *Lombardi*, 656 F.3d at 1351; *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345 (Fed. Cir. 2010); *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009); *Althen*, 418 F.3d at 1277, 1280–81).

However, the Federal Circuit has recognized two exceptions that permit special masters to opine on a petitioner's diagnosis. *See Contreras*, 107 Fed. Cl. at 293. In *Broekelschen*, the Federal Circuit determined that "in an atypical case, where 'the question of causation turns on which injury [the petitioner] suffered,' the special master is permitted to choose between two competing diagnoses of dissimilar diseases as a first step in the causation analysis." 618 F.3d at 1346. There, the Federal Circuit noted that the case was atypical because "1) the injury itself was in dispute; 2) the proposed injuries differed significantly in their pathology; and 3) the question of causation turns on which injury petitioner suffered." *Id.* at 1343–44. Importantly, the *Broekelschen* court distinguished cases where differing diagnoses of the alleged vaccine injury were along a continuum of related conditions, observing that "in those cases, a precise diagnosis would be unnecessary for the causation analysis." *Id.* at 1346 (distinguishing *Andreu*, 569 F.3d at 1378, 1381 and *Kelley v. Sec'y of Health & Hum. Servs.*, 68 Fed. Cl. 84, 100–01 (2005)).

In *Lombardi*, the Federal Circuit recognized a second exception to the general rule that special masters should not diagnose alleged vaccine injuries. 656 F.3d at 1353; *Contreras*, 107 Fed. Cl. at 294–95. There, petitioner's experts disagreed as to petitioner's injury: one concluding

17

that she suffered from transverse myelitis while the other expert testified that petitioner suffered from either chronic fatigue syndrome or systemic lupus erythematosus. *Lombardi*, 656 F.3d at 1346, 1352. The Secretary's expert disputed those diagnoses and proposed five alternative possible diagnoses. *Id.* at 1352. In holding that it was appropriate for the special master to initially determine "what injury, if any, was supported by the evidence presented in the record before applying the Althen test to determine causation," the Federal Circuit reasoned that "[i]n the absence of a showing of the very existence of *any* specific injury of which the petitioner complains, the question of causation is not reached." *Id.* at 1352–53. Therefore, the Federal Circuit held that a special master is permitted under *Lombardi* "to attempt to diagnose the petitioner's illness in an unusual case where: (1) the petitioner presents conflicting diagnoses of her alleged vaccine injury; (2) the experts have 'extreme disagreement' as to the malady suffered; and, (3) the diagnoses are not along a continuum of similar conditions." *Id.*; *Contreras*, 107 Fed. Cl. at 294.

In contrast, in *Contreras*, the Court of Federal Claims held that the special master erred by diagnosing the petitioner's illness – as TM and not Guillain-Barré syndrome ("GBS") – before evaluating the *Althen* prongs. 107 Fed. Cl. 280, 292-93. The Court reasoned that the case contained "ample evidence that TM and GBS are similar diseases with similar pathologies" and the parties' "unified position [was] that an exact diagnosis of [the petitioner's illness] was not required to rule on causation." *Id.* at 293. The Court of Federal Claims articulated that "the general rule is that the special master should not conduct a differential diagnosis, at the outset of the causation analysis, to choose one diagnosis over another, or over a combination of diagnoses." *Id.*, *aff'd* 844 F.3d 1363; *see also Andreu*, 569 F.3d 1367, 1378 (holding that the special master need not determine whether an initial seizure was febrile or afebrile for purposes of assessing vaccine causation).

Relevant to this inquiry, the Vaccine Act provides that a special master must consider the record as a whole including any medical diagnosis contained therein. Section 300aa-13(b)(1). However, no diagnosis in the medical records is "binding on the special master." *Id.* Rather, "[i]n evaluating the weight to be afforded to any such diagnosis… the special master… shall consider the entire record and the course of the injury, disability, illness, or condition until the date of the judgment of the special master." *Id.* The special master shall also consider any expert opinions and additional medical scientific evidence in the record. *Id.*

## B. Causation

To receive compensation through the Program, petitioner must prove either (1) that she suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that she received, or (2) that he suffered an injury that was actually caused by a vaccination. See §§ 11(c)(1), 13(a)(1)(A); *Capizzano v. Sec'y of Health & Hum. Servs.,* 440 F.3d 1317, 1319-20 (Fed. Cir. 2006). When, as here, petitioners allege that they suffered an injury that was actually caused by the vaccination, petitioners must establish, by preponderant evidence: (1) a medical theory causally connecting the vaccine and her injury ("*Althen* Prong One"); (2) a logical sequence of cause and effect showing that the vaccine was the reason for her injury ("*Althen* Prong Two"); and (3) a showing of a proximate temporal relationship between the vaccine and her injury ("*Althen* Prong Three"). § 13(a)(1); *Althen*, 418 F.3d at 1278. There must

18

be preponderant evidence for each *Althen* prong. *Caves v. Sec'y of Health & Human Servs.,* 100 Fed. Cl. 119, 132 (2011), *aff. per curiam,* 463 Fed. Appx. 932 (Fed. Cir. 2012).

The causation theory must relate to the injury alleged. The petitioner must provide a sound and reliable medical or scientific explanation that pertains specifically to this case, although the explanation need only be "legally probable, not medically or scientifically certain." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Recently, in *Kottenstette,* the Federal Circuit reiterated that proof of causation does not "require identification and proof of specific biological mechanisms[.]" *Kottenstette v. Sec'y of Health & Hum. Servs.,* -- Fed.Appx.—(Fed. Cir. June 15, 2021) (citing *Knudsen v. Sec'y of Health & Hum. Servs.,* 35 F.3d 543, 549 (Fed. Cir. 1994). Causation "can be found in vaccine cases….without detailed medical and scientific exposition of the biological mechanisms." *Knudsen,* 35 F.3d 543, 548-49 (Fed. Cir. 1994). It is not necessary for a petitioner to point to conclusive evidence in the medical literature linking a vaccine to the petitioner's injury, as long as the petitioner can show by a preponderance of evidence that there is a causal relationship between the vaccine and the injury, whatever the details of the mechanism may be. *Moberly v. Sec'y of Health & Hum. Servs.,* 592 F.3d 1315, 1325 (Fed. Cir. 2010). The petitioner need not make a specific type of evidentiary showing such as "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano*, 440 F.3d at 1325. Instead, petitioner may satisfy his burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325-26.

Petitioner cannot establish entitlement to compensation based solely on his assertions; rather, a vaccine claim must be supported either by medical records or by the opinion of a medical doctor. § 13(a)(1). In determining whether petitioner is entitled to compensation, the special master shall consider all material in the record, including "any . . . conclusion, [or] medical judgment . . . which is contained in the record regarding . . . causation." § 13(b)(1)(A). The undersigned must weigh the submitted evidence and the testimony of the parties' proffered experts and rule in petitioner's favor when the evidence weighs in his favor. *See Moberly*, 592 F.3d at 1325-26 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence."); *Althen*, 418 F.3d at 1280 (noting that "close calls" are resolved in petitioner's favor).

In Vaccine Act cases, expert testimony may be evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-96 (1993); *see also Cedillo*, 617 F.3d at 1339 (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). In Vaccine Program cases, the *Daubert* analysis has been used in the weighing of the scientific evidence actually proffered and heard rather than as a tool for the pre-trial exclusion of expert testimony. *Davis v. Sec'y of Health & Hum. Servs.,* 94 Fed. Cl. 53, 66–67 (Fed. Cl. 2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect   to persuasiveness of expert testimony already admitted"), *aff'd*, 420 F. App'x 923 (Fed. Cir. 2011). The flexible use of the *Daubert* factors to determine the persuasiveness and/or reliability of expert testimony in

19

Vaccine Program cases has routinely been upheld. *See, e.g.*, *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 742–45 (2009).

Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1362 (Fed. Cir. 2000)). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder,* 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 146 (1997)). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly,* 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

If the petitioner makes a *prima facie* case supporting vaccine causation-in-fact, the burden shifts to respondent to show by a preponderance of the evidence that the injury is instead due to factors unrelated to the administration of the vaccine. *Deribeaux v. Sec'y of Health & Human Servs.,* 717 F.3d 1363, 1367 (Fed. Cir. 2013) (citing Section 13(a)(1)(B)). Respondent has the burden of demonstrating that: "[A] factor unrelated to the vaccination is the more likely or principal cause of injury alleged. Such a showing establishes that the factor unrelated, not the vaccination, was 'principally responsible' for the injury. If the evidence or alternative cause is seen in equipoise, then the government has failed in its burden of persuasion and compensation must be awarded." *Knudsen,* 35 F.3d at 551. Close calls regarding causation must be resolved in favor of the petitioner. *Althen*, 418 F.3d at 1280 (holding that Congress created a system in which "close calls regarding causation are resolved in favor of injured claimants").

## IV.    Analysis

### A.  Petitioner's Diagnosis

As a threshold matter, a petitioner must establish that he suffered from the condition for which he seeks compensation. *Broekelschen v. Sec'y of Health & Humn. Servs.,* 618 F.3d 1339, 1346 (Fed. Cir. 2010). The Federal Circuit has made clear "the statute places the burden on petitioner to make a showing of at least one defined and recognized injury." *Lombardi v. Sec'y of Health & Hum. Servs.,* 656 F.3d 1343, 1353 (Fed. Cir. 2011) (affirming a special master's decision to dismiss a petition when the petitioner could not establish that she had any of the three diagnoses alleged."). "The function of the special master is not to 'diagnose' vaccine-related injuries, but instead to determine based on the record evidence as a whole and the totality of the case, whether it has been shown by a preponderance of evidence that a vaccine caused [petitioner's] injury." *Id.* at 1352-53 (internal citations omitted). Thus, where "the existence and nature of the injury itself in dispute, it is the special master's duty to *first determine* which injury

is best supported" by the evidence before applying the *Althen* test to determine causation. *Id.* at 1352 (citing *Broekelschen,* 618 F.3d at 1345) (emphasis added).

The parties dispute petitioner's proper diagnosis in this matter. In her petition, petitioner alleged that the influenza vaccine she received on October 8, 2015 caused her to develop vertigo, dizziness, and labyrinthitis. Pet. at ¶ 16; *see also* Pet'r. Mot. at 1. Thereafter, petitioner argued that she developed a migraine disorder that manifests as a vertigo syndrome, including Benign Paroxysmal Positional Vertigo ("BPPV") and Persistent Postural-Perceptual Dizziness ("PPPD"). Pet'r. Reply at 1, 5. Respondent argued that petitioner alleged multiple different injuries, including vertigo, dizziness, vestibular migraine, vestibular neuritis, and BPPV. Resp't. Response at 11-12. Respondent contends that petitioner's various symptoms amount to a collection of symptoms and not a medically recognized injury. *Id.* at 12. Further, respondent argues that petitioner's experts did not agree on a diagnosis, with Dr. Axelrod positing a theory of vaccine causation that relied upon petitioner developing an autoimmune condition, such as vestibular neuritis, but Dr. Djalilian, opined that petitioner's injury is a migraine condition with a component of BPPV. *Id.* at 12; *see also* Pet'r. Ex. 47 at 2; Pet'r. Ex. 48 at 14 ("I believe that vaccination in [petitioner] induced a migraine phenomenon that led to migraine related benign positional vertigo within 72 hours, which progressed into subsequent chronic BPPV.").

Both neuro-otolaryngologists who provided opinions in this matter, Dr. Djalilian for petitioner, and Dr. Ying, opined that petitioner's diagnosis is vestibular migraine and accompanying vertigo/dizziness disorder. Pet'r. Ex. 48 at 15 ("The vaccination in October 2015 initially induced the migraine process in [petitioner], which resulted in the vertigo within 72-hours of the vaccination. The migraine process then progressed and led to chronic vertigo, which more likely than not is partly due to vestibular migraine."); Resp't. Ex. A at 6 ("Reviewing the records [petitioner] met the diagnostic criteria for these three conditions: Vestibular migraine, PPPD, and cervicogenic dizziness. She has a history of migraine headache that now evolved into vestibular migraine.").

As explained in the medical literature, there is a close relationship between migraine and vertigo. *See* Pet'r. Ex. 66 at 4[16] ("Vertigo is a well-documented manifestation of migraine headache in the literature…"); Pet'r. Ex. 77 at 4[17] ("Increasing recent evidence has highlighted the association between migraine and BPPV."); Pet'r. Ex. 71 at 1[18] ("The epidemiological link between vertigo and migraine has been recently confirmed on the population level."); and Pet'r. Ex. 69 at 5[19] ("Recognition of an association between migraine and vertigo dates back almost

---

[16] Bruss, D. et al., *Migraine Features in Patients with Recurrent Benign Paroxysmal Positional Vertigo,* 42 Otol. Neurotol. 461-465 (2021). [Pet'r. Ex. 66].

[17] Yu, J. et al., *Pseudo-Benign Paroxysmal Positional Vertigo: A Retrospective Study and Case Report,* 11 Front. in Neurol. https://doi.org/10.3389/fneur.2020.00187 (2020). [Pet'r. Ex. 77].

[18] Von Brevern, M. et al., *Epidemiological Evidence for a Link Between Vertigo and Migraine,* 21 J. of Vest. Res. 299-304 (2011). [Pet'r. Ex. 71].

[19] Teixido, M. et al., *Migraine and Benign Paroxysmal Positional Vertigo,* 131 J. of Laryngology & Otology 508-513 (2017). [Pet'r. Ex. 69].

150 years).  The Bisdorff article states that "vestibular migraine is considered to be the second most common cause of vertigo and the most common cause of spontaneous episodic vertigo." Resp't. Ex. A, Tab 3 at 1.[20]  Symptoms of vestibular migraine can vary, but include spontaneous and positional vertigo, head motion vertigo/dizziness and ataxia of variable duration, with most episodes having no temporal relationship with headaches.  *Id.* at 2.  Vestibular migraines predominantly affect women and often vestibular symptoms in vestibular migraine do not begin until several years after the onset of typical migraines.  Pet'r. Ex. 64 at 1.[21]

Benign Paroxysmal Positional Vertigo ("BPPV") is "the most common cause of vertigo in adults, and accounts for 50 percent of all dizziness in adults."  Pet'r. Ex. 69 at 1.  Faralli et al. describes BPPV as affecting the posterior labyrinth and the vestibular disturbance that "is caused by floating otoconial material that triggers the critical endolymphatic currents underlying attacks."  Pet'r. Ex. 70 at 1.[22]  The objective sign of BPPV is a paroxysmal nystagmus, which is triggered by diagnostic maneuvers.  *Id.*  BPPV is the most common vestibular disorder in patients with migraine, with the prevalence of migraine in patients with idiopathic BPPV being twice as high as that in age and sex matched controls. *Id.*; *see also* Pet'r. Ex. 71 at 4.  While the mechanism for vestibular symptoms and signs associated with migraine "are not well understood," Teixido suggests that BPPV "is a recognized consequence of ischaemic damage of the inner ear, presumable due to release of otoconia from the macular membrane."  Pet'r. Ex. 69 at 5.  Further, Teixido states, "In all probability, patients with migraine suffer recurrent damage to the inner ear due to vasospasm or some other mechanism that predispose them to recurrent bouts of BPPV."  *Id.*

Persistent Postural-Perceptual Dizziness ("PPPD") is also a vestibular disorder.  Resp't. Ex. A, Tab 5;[23] *see also* Pet'r. Ex. 78 at 1.[24]  PPPD is characterized by 3 or more months of non-spinning vertigo, dizziness, or unsteadiness that are present on most days and are exacerbated by upright posture, active or passive movement, and exposure to moving or complex visual stimuli. Resp't. Ex. A, Tab 5 at 1.  "PPPD may be precipitated by conditions that disrupt balance or cause vertigo, unsteadiness, or dizziness, including peripheral or central vestibular disorders, other medical illnesses, or psychological distress."  *Id.*  The Sarna article, on which Dr. Djalian is a co-author, stated that PPPD can co-exist with migraine or vestibular migraine, finding that there is a high prevalence of migraine and PPPD and opining that "migraine itself may be considered a

---

[20] Bisdorff, Alexandre R., *Management of Vestibular Migraine,* 4(3) Ther. Adv. Neurol. Disord. 183-191 (2011). [Resp't. Ex. A, Tab 3].

[21] Liu, Y. et al., *The Intimate Relationship Between Vestibular Migraine and Meniere Disease: A Review of Pathogenesis and Presentation,* 2016 Behavioral Neurol. http://dx.doi.org/10.1155/2016/3182735 (2016).  [Pet'r. Ex. 64].

[22] Faralli, M. et al., *Benign Paroxysmal Positional Vertigo and Migraine: Analysis of 186 Cases,* 10 B-ENT, 133-139 (2014).  [Pet'r. Ex. 70].

[23] Staab. J. et al., *Diagnostic Criteria for Persistent Postural-Percepual Dizziness (PPPD): Consensus Document of the Committee for the Classification of Vestibular Disorders of the Barany Society,* 27 J. of Vestib. Res. 191-208 (2017).  [Resp't. Ex. A, Tab 5].

[24] Sarna, B. et al., *Migraine Features in Patients with Persistent Postural-Perceptual Dizziness,* 130(12) Sage J. 1326-1331 (2021).  [Pet'r. Ex. 78].

trigger and cause for the persistence of PPPD." Pet'r. Ex. 78 at 9. The authors noted that migraine and PPPD share clinical features, "particularly hypersensitivity to various sensory stimuli (visual motion, motion, light, sounds, and smells that may potentiate dizziness, motion sickness, and other vestibular symptoms experienced by migraine patients." *Id.*

Petitioner's medical records are consistent with the signs and symptoms of vestibular migraine and BPPV and/or PPPD and she was later diagnosed with both conditions by her treating physicians. When petitioner first went to the emergency department on October 10, 2015, she presented with dizziness, nausea, and vomiting. Pet'r. Ex. 13 at 5—6. She had an evocable nystagmus, and she was diagnosed with BPPV. *Id.* at 12. When petitioner underwent a videonystagmography (VNG) on November 4, 2015 she also underwent several other diagnostic tests. The Dix Hallpike Maneuver evoked a rotary nystagmus and subjective vertigo, the High Frequency Headshake also evoked a 4 deg/sec right beating post head shake nystagmus, and her Bithermal Caloric Test demonstrated a 94.5% unilateral weakness in her left ear. Pet'r. Ex. 20 at 38. The VNG results were noted as "abnormal and indicative of a peripheral nervous system involvement. Results indicate left BPPV and a lesion of the left lateral canal or its afferent nerve. The presence of right beating post head shake nystagmus indicates that central compensation is not yet complete." *Id.*

At petitioner's first neurology evaluation on December 11, 2015, petitioner reported that her dizziness began on October 10th, and she experiences dizziness "when she gets up," neck aches that radiate to her left arm, and a headache feeling. Pet'r. Ex. 13 at 54. Petitioner reported a "headache over the bridge [of her] nose and the left eye," that can feel warm, pulse, and throb. *Id.* She also endorsed sensitivity to light and sound. *Id.* At this appointment, a left sided rotary nystagmus was observed when petitioner was looking to the left. *Id.* at 57. Petitioner was diagnosed with BPPV, daily headache, and nystagmus. *Id.* at 59. APNP Dill also wrote that petitioner "also had neck issues and I suspect problems with the C-5 nerve root, there is some weakness. Of concern is the positive Romberg x 2 going backward….She also sounds to have migraine related to this but there is more eye pressure to the left and dizziness to the left." *Id.* at 59.

Petitioner's brain MRI performed on December 24, 2015 revealed "a mild amount of foci of high FLAIR and T2 signal in bilateral white matter, mainly involving the subcortical white matter of bilateral frontal lobes and to a lesser extent the parietal lobes." Pet'r. Ex. 13 at 74. The impression was, "mild white matter foci as above may be from old small vessel ischemic disease changes or chronic migraines." *Id.* At petitioner's follow-up appointment with APNP Dill on January 7, 2016, petitioner reported neck pain radiating up the left side of her head causing a constant headache. *Id.* Petitioner stated that "she does have a history of migraines but does not feel that these are migraines." *Id.* Petitioner also reported that her BPPV "has greatly subsided with no signs of nystagmus," but her head pressure and dizziness remained. *Id.* at 94. Her left sided nystagmus was not elicited at this appointment. *Id.* at 98. APNP Dill assessed petitioner with daily headache and BPPV, and wrote, "She does have a component of migraine. This could be transformed migraine. The nystagmus has improved," and prescribed her gabapentin. *Id.*

After unsuccessful treatment with gabapentin and prednisone, petitioner had an appointment with Dr. Fallon Schloemer, on June 27, 2016. Pet'r. Ex. 7 at 18. Petitioner reported

23

a "floating sensation in her head with pressure in her temples and coming up from back of [her] neck." *Id.* Petitioner also described her pain as more like "pressure" but it was constant with photophobia and phonophobia. *Id.* Dr. Schloemer's impression was that petitioner "met the criteria for vestibular migraine, but likely as a component of 3PD, as well as cervicogenic dizziness. Exam also notable for left occipital neuralgia." *Id.* at 21. Petitioner was also assessed by Dr. David Friedland on the same day, and he agreed with Dr. Schloemer's assessment and recommendation that petitioner begin Effexor immediately. *Id.* at 56. Dr. Friedland wrote that petitioner's "issues are consistent with both vestibular migraine as well as persistent postural and perceptual dizziness." *Id.* at 55. At a follow-up appointment on August 29, 2016, petitioner reported that the Effexor did not significantly improve her symptoms, and that Indomethacin and Tizanidine were not "terribly effective," but she did get those prescriptions refilled. *See* Pet'r. Ex. 7 at 138, 176. Dr. Schloemer diagnosed petitioner with "history of migraine headache which occur chronically for in excess of six months. The patient experienced at least 4 hours of headache pain at least 15 days during this past 30 days. The headaches are associated with migraine associated symptoms of exertional exacerbation, photophobia, phonophobia and vomiting or nausea with the different individual headache attacks." Pet'r. Ex. 7 at 138. Dr. Schloemer recommended that petitioner continue indomethacin and tizanidine for headaches and dizziness and was going to get pre-authorization for Botox injections. *Id.*

Given the close relationship described in the medical literature between vestibular migraine and BPPV/PPPD, it is not necessary to distinguish which vertigo-disease entity is the most appropriate diagnosis. Further, both Drs. Djalilian and Ying endorsed the co-existence of BPPV with PPPD with vestibular migraine. Additionally, the medical literature indicates that vestibular migraine is a condition that can cause BPPV or PPPD, although the relationship is not fully understood.

Despite petitioner inability to initially articulate a unifying diagnosis of vestibular migraine with BPPV/PPPD, petitioner's expert's opinion, the medical literature, and petitioner's clinical course and diagnosis of her treating physicians provide preponderant evidence supportive of a diagnosis of vestibular migraine with BPPV/PPPD.

### B. Causation

#### 1. *Althen* Prong One

Under the first prong of *Althen,* a petitioner must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford,* 451 F.3d at 1355-56. To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Human Servs.,* 35 F.3d 543, 548 (Fed. Cir. 1994). Proof of causation does not "require identification and proof of specific biological mechanisms[.]" *Id.* at 549. "It is not necessary for a petitioner to point to conclusive evidence in the medical literature linking a vaccine to the petitioner's injury, as long as the petitioner can show by preponderance of the evidence that there is a causal relationship between the vaccine and the injury, whatever the details of the mechanism may be." *Moberly v. Sec'y of Health & Human Servs.,* 592 F. 3d 1315, 1325 (Fed. Cir. 2010).

24

The undersigned finds that petitioner has failed to provide by preponderant evidence a sound and reliable theory to explain how the flu vaccine can cause petitioner's vestibular migraine and BPPV/PPD.

Dr. Axelrod opined that the flu vaccine, through the mechanism of molecular mimicry was the cause of her developing BPPV, after developing vestibular neuritis. Pet'r. Ex. 47 at 2. Dr. Axelrod stated proteins found in the perilymph system share similar structures to antigens contained in the influenza vaccine petitioner received, and an immune reaction targeted to these structures could lead to T-cell mediated damage. *Id.* at 5-6. Dr. Axelrod referenced an article by Schmitt et al., which analyzed perilymph fluid from patients with sensorineural hearing loss, to support his theory that the proteins in the inner ear can be the target of an autoimmune reaction. *Id.* at 4. However, as respondent's expert, Dr. Matloubian observed, the Schmitt article analyzed perilymph samples from patients with varying degrees of hearing loss, and petitioner did not have any associated hearing loss with her condition. *See* Resp't. Ex. C at 5-6; *see also* Pet'r. Ex. 38.

Dr. Axelrod also relied upon an article by Gacek to support his causal theory, noting that the authors found inflammatory changes to vestibular neurons as a cause of BPPV, instead of a simple mechanical dysfunction. Pet'r. Ex. 47 at 4. While Gacek may support Dr. Axelrod's statements that BPPV is caused, in part, by degeneration of vestibular neurons caused by an inflammatory process, the article does not support Dr. Axelrod's theory for vaccine causation. Gacek examined the temporal bone of five patients with a history of BPPV and found a loss of vestibular ganglion cells in all samples. Pet'r. Ex. 25 at 3. The authors opined that the "pathological change in BPPV is caused by degeneration of vestibular neurons, rather than an alteration in receptor sensitivity." *Id.* at 4-5. However, the authors also opined that the likely cause of the ganglionic degeneration was "probably the reactivation of a latent neurotropic viral infection," and that the most likely causative agents are members of the alpha herpes virus groups because of "their ubiquity, their affinity for sensory ganglia, and the presence of viral DNA products in patients with vestibular ganglionitis." *Id.* at 6.

More fatal to petitioner's theory is the fact that Dr. Axelrod does not opine how the flu vaccine can cause vestibular migraine with BPPV and/or PPPD. Dr. Axelrod primarily proposed a diagnosis of vestibular neuritis an autoimmune condition, which the petitioner most likely does not have. Instead, the literature suggests that vestibular migraines and BPPV/PPPD share some a common pathophysiology, albeit not well understood. *See* Pet'r. Ex. 72 at 3. Teixido explains that vasospasm of the labyrinthine arteries is a possible mechanism for the cause of vestibular symptoms associated with migraine and that "[BPPV] is a recognized consequence of ischemic damage to the inner ear, presumably due to release of otoconia from the macular membrane. Pet'r. Ex. 69 at 5. The same article explains, "The vasospasm associated with the classic visual aura of migraine is almost certainly secondary to a primary neuronal metabolic depression. Similarly, vasospasm in the inner ear might also be the result of a primary metabolic abnormality in the inner ear itself." *Id.*

Dr. Djalilian attempted to bridge the gap between petitioner's diagnosis and the flu vaccine, by referring to articles that identify headache as an adverse reaction to the flu exact vaccine. Pet'r. Ex. 48 at 14. While some of these articles do not discuss the exact same type of

25

flu vaccine petitioner received, like the Baxter article which examined adverse events after administration of the  live attenuated flu vaccine, most consistently do report headache as a common adverse event.  *See e.g.* Pet'r. Ex. 50 at 3[25] ("headache and myalgia were the most common systemic reactions….All reactions resolved spontaneously within a few days, except one case of grade 3 headache, which resolved in 2 [days] with medication."); Pet'r. Ex. 53 at 6[26] ("The most frequently reported solicited systemic reactions were headache, malaise, and myalgia…All solicited reactions were generally transient.  Almost all occurred within 3 days and more than 98% disappeared within 8 days.").  However, he does not credibly explain how a transient headache after vaccination could result in vestibular migraine with BPPV and/or PPPD.

Finally, none of the articles filed reference any vaccines as a possible cause of vestibular migraine or even vestibular neuritis.  The closest the literature comes to describing an immune initiated response is in the context of vestibular neuritis, which is an injury petitioner was not diagnosed with and did not assert she suffered.  However, even if petitioner were able to establish she experienced vestibular neuritis, the medical literature does not associate vaccines with vestibular neuritis.  The Omron and Strupp articles both explain that acute vestibular neuritis is likely caused by a reactivation of the latent herpes virus that is in the vestibular ganglia.  Resp't. Ex. C, Tab 5 at 2[27]; Pet'r. Ex. 23 at 19[28].  Strupp provides, "If HSV is the most likely candidate, it can be assumed to reside in a latent state in the vestibular ganglia, for example, in the ganglionic nuclei as reported in other cranial nerves.  As a result of intercurrent factors, it is thought that the virus suddenly replicates, inducing inflammation and edema, causing secondary cell damage of the vestibular ganglion cells and axons in the bony channels of the skull through which the vestibular nerve passes."  Resp't. Ex. C, Tab 5 at 3.  The reactivation of herpes virus in the vestibular ganglia is also endorsed in the Gacek article as a possible cause for ganglionic degeneration found in the samples of patients with BPPV.  *See* Pet'r. Ex. 25 at 6.

Overall, the undersigned finds that in this case, petitioner has not presented a sound and reliable theory for how the flu vaccine can cause vestibular migraine with associated BPPV and/or PPPD and thus cannot demonstrate *Althen* prong one.

### 2.  *Althen* Prong Two

Given that petitioner has not established *Althen* prong one, the undersigned need not address the remaining prongs of vaccine causation.  *See Caves v. Sec'y of Health & Hum. Servs.,* 100 Fed. Cl. 119, 145 (2011).  Nevertheless, for the sake of completeness, I will consider the remaining two prongs.

Under *Althen* prong two, a petitioner must prove by a preponderance of the evidence that

---

[25] Demeulemeester, M. et al., *Rapid Safety Assessment of a Seasonal Intradermal Trivalent Influenza Vaccine,* http://dx.doi.org/10.1080/21645515.2016.1253644 (2017).  [Pet'r. Ex. 50].

[26] Gorse, G. et al., *Safety and Immunogenicity of a Quadrivalent Intradermal Influenza Vaccine in Adults,* 33 Vaccine 1151-1159 (2015).  [Pet'r. Ex. 53].

[27] Strupp, M. et al., *Acute Unilateral Vestibulopathy,* 33 Neurol. Clin. 669-685 (2015).  [Resp't. Ex. C, Tab 5].

[28] Omron, R., *Peripheral Vertigo,* 37 Emerg. Med. Clin. N. Am. 11-28 (2019). [Pet'r. Ex. 23].

there is a "logical sequence of cause and effect showing that vaccination was the reason for the injury." *Capizzano,* 440 F.3d at 1324 (quoting *Althen,* 418 F.3d at 1278). The sequence of cause and effect must be "'logical' and legally probable, not medically or scientifically certain." *Althen,* 418 F.3d at 1278. "A reputable medical or scientific explanation must support this logical sequence of cause and effect," and "treating physicians are likely to be in the best position to determine whether a logical sequence of cause-and-effect show[s] that the vaccination was the reason for the injury. *Paluck v. Sec'y of Health & Hum. Servs.,* 786 F.3d 1373, 1385 (Fed. Cir. 2015) (quoting *Andreu,* 569 F.3d at 1375). Petitioner is not, however, required to "eliminate alternative causes as part of establishing [their] prima facie case." *Doe v. Sec'y of Health & Hum. Servs.,* 601 F.3d 1349,1357-58 (Fed. Cir. 2010).

The undersigned finds that petitioner cannot demonstrate by preponderant evidence a logical sequence of cause and effect that the flu vaccine caused her vestibular migraine with BPPV/PPPD.

Even though the onset of petitioner's vertigo or vestibular symptoms began shortly after receiving the flu vaccine, this delayed onset of vestibular symptoms in vestibular migraine is consistent with disease itself. Petitioner's medical records endorse a history of migraine prior to the vaccination. *See* Pet'r. Ex. 13 at 95 ("She does have a history of migraines but she does not feel that these are migraines."). When petitioner was evaluated by Dr. David Friedland, he noted that her brain MRI had findings "consistent with chronic migraine." Pet'r. Ex. 7 at 54. Liu explains that the onset of vestibular symptoms in vestibular migraine "do not begin until several years after the onset of typical migraines." *Id.* Furman et al. observed that other studies of vestibular migraine found that "migraine headache typically predated vestibular system symptoms in 19 adults with migrainous vertigo by an average of 8.4 years." Resp't. Ex. A, Tab 4 at 2. Thus, petitioner's medical records support the onset of her migraine condition prior to the vaccination and followed the course of vestibular migraine, with vestibular symptoms being delayed after the onset of migraines.

Accordingly, petitioner has failed to provide preponderant evidence to support *Althen* prong two.

### 3.   *Althen* Prong Three

To satisfy *Althen* prong three, petitioner first must establish the "timeframe for which it is medically acceptable to infer causation," and then, they must demonstrate that the onset of the disease occurred in this period. *Shapiro v. Sec'y of Health & Human Servs.,* 101 Fed. Cl. 532, 542-53 (2011); *recons. denied after remand on other grounds,* 105 Fed. Cl. 353 (2012), *aff'd without op.*, 503 F.App'x 952 (Fed. Cir. 2013).

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d. at 1278. The special master cannot infer causation from temporal proximity alone. *Thibaudeau v. Sec'y of Health & Human Servs.,* 24 Cl. Ct. 400, 403-04 (1991); *see also Grant v. Sec'y of Health & Human Servs.,* 956 F.2d 1144 (Fed. Cir. 1992) ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period…[w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting

27

*Hasler v. U.S.*, 718 F.2d 202, 205 (6th Cir. 1983)).  Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after administration of a vaccine for the vaccine to be the cause.  *de Bazan,* 539 F.3d at 1352.  However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked."  *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.,* 685 F.3d at 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

The medical records show that petitioner received the flu vaccine on October 7, 2015.  On October 10, 2015, petitioner sought treatment at the emergency department, stating that she had begun vomiting the night before and was feeling very lightheaded.  Pet'r. Ex. 13 at 5.  Petitioner stated that the felt that the room was spinning.  *Id.*  This timeframe would put onset of petitioner's symptoms at approximately 48-hours post-vaccination, or on October 9, 2015.

Petitioner's expert, Dr. Axelrod opined that the onset of petitioner's first symptom of her disease, vertigo, began approximately three days after she received the October 7, 2015 flu vaccine.  Pet'r. Ex. 47 at 9.  He stated that three days post-vaccination is an acceptable timeframe for an adaptive immune response to occur after vaccination.  *Id.* at 7.  Dr. Axelrod also stated that memory T-cell response to a vaccine could cause a faster response to a vaccination, as likely it did in this matter, as petitioner had previously received flu vaccines.  *Id.* Dr. Matloubian agreed with Dr. Axelrod that a memory T-cell response to a vaccine could occur within 2-3 days.  Resp't Ex. C at 12.  However, Dr. Matloubian argued that petitioner experienced symptoms in less than 48-hours, making it unlikely that an antibody to the vaccine was the cause of the damage to petitioner's inner ear.  *Id.*

Although petitioner sought medical treatment for a headache, nausea, and vomiting that began approximately two days post -vaccination, the likelihood that her symptoms of BPPV and PPPD were delayed sequalae of her pre-existing vestibular migraine, make it unlikely that her symptoms occurring two days post vaccination were caused by the vaccine.  While the occurrence of a recall response to a vaccine could occur in two days, if the condition was secondary to a prior migraine disorder as the literature suggests is likely in that these symptoms are often delayed from days to months after the onset of migraines, the vaccine is unlikely to have played a causative role.  Accordingly, petitioner is unable to demonstrate *Althen* prong three by preponderant evidence

## V.    Conclusion

For the reasons discussed above, the undersigned finds that petitioner has failed to establish by preponderant evidence that the flu vaccine she received caused her to develop vestibular migraines with BPPV/PPPD.  Therefore, petitioner is not entitled to compensation, and the petition must be dismissed.

In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with this decision.

**IT IS SO ORDERED.**

<u>s/Thomas L. Gowen</u>
Thomas L. Gowen
Special Master